People v O'Keefe (2025 NY Slip Op 50909(U))

[*1]

People v O'Keefe

2025 NY Slip Op 50909(U)

Decided on June 4, 2025

County Court, Warren County

Smith, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 4, 2025
County Court, Warren County

The People of the State of New York

against
Shaun O'Keefe, Defendant

File No. SMZ-70532-24/001

For the People:
Connor F. Smith
Assistant District Attorney
Warren County District Attorney's Office
For the Defendant: 
Erin K. Komon
1st Assistant Public Defender
Warren County Public Defender's Office

Robert A. Smith, J.

On December 16, 2014, the above-named defendant, SHAUN O'KEEFE, was convicted in Jefferson County, Wisconsin by plea of guilty of one count of Engaging in Repeated Acts of Sexual Assault of the Same Child in violation of Wisconsin Statute § 948.025(1)(e), one count of Exposing Genitals or Pubic Area in violation of Wisconsin Statute § 948.10(1)(a), and one count of Sexual Intercourse with a Child Aged 16 or Older in violation of Wisconsin Statute § 948.09. These pleas satisfied additional charges consisting of one count of Sexual Assault of a Child in the First Degree in violation of Wisconsin Statute § 948.02(1)(c), one count of False Imprisonment in violation of Wisconsin Statute § 940.30, one count of Child Enticement in violation of Wisconsin Statute § 948.07(3), and two counts of Sexual Intercourse with a Child Aged 16 or Older in violation of Wisconsin Statute § 948.09. For his convictions he received an aggregate sentence of 10 years incarceration in the Wisconsin Department of Corrections (hereinafter "DOC") to be followed by 10 years of extended supervision. On September 17, 2024 [FN1]
, a transfer of the defendant's supervision was accepted by the New York State Department [*2]of Corrections and Community Supervision (hereinafter "DOCCS"), and the defendant was released from the supervision of DOC to the supervision of DOCCS on October 8, 2024, with a reported address within Warren County, New York [FN2]
. As a result of now living in the State of New York, as well as the nature of his Wisconsin convictions [FN3]
, the defendant is required to register as a sex offender pursuant to the New York State Sex Offender Registration Act (hereinafter "SORA"). 
A scheduling order was issued by this Court on December 3, 2024, scheduling the defendant's SORA hearing for January 29, 2025 at 9:30 a.m. This Court then rescheduled the SORA hearing to March 24, 2025 to allow the parties to receive and review pertinent documentation which had been requested from various entities in the State of Wisconsin. On January 15, 2025, the People filed a letter argument with attachments with this Court and SORA-Counsel containing their proposed risk level scoring of the defendant. The January 15, 2025 letter also advised that the People were seeking a sexually violent offender designation pursuant to Correction Law § 168-a(3)(b). On January 23, 2025, the People provided the Court and SORA-Counsel with a transcript of the defendant's plea and sentence in Wisconsin. On March 10, 2025, the People filed another letter with attachments with this Court and SORA-Counsel in support of their argument for the assignment of points in this matter.
The defendant then appeared before this Court with SORA-Counsel on March 24, 2025 for a judicial determination of the appropriate SORA classification pursuant to Article 6-C of the New York State Correction Law. In advance of the hearing the Court received and reviewed a SORA Risk Assessment Instrument (hereinafter "RAI"), Sex Offender Designation Form, the New York State Board of Examiners of Sex Offenders (hereinafter "BESO") Case Summary, and the People's January 15, 2025; January 23, 2025; and March 10, 2025 submissions. A copy of the same was received by the defendant/SORA-Counsel. The RAI indicated that the defendant was a presumptive Level 2 sex offender, and did not recommend any designation. 
On the date of the hearing SORA-Counsel stipulated to the receipt of People's Exhibits 1-3 into evidence [FN4]
. People's Exhibit 1 is a copy of the People's January 15, 2025 letter argument [*3]with attachments. People's Exhibit 2 is a copy of the People's January 23, 2025 submission containing the transcript of the defendant's plea and sentence in Wisconsin. People's Exhibit 3 is a copy of the People's March 10, 2025 submission containing the defendant's Wisconsin DOC records. SORA-Counsel introduced Exhibits A-G into evidence at the hearing upon the stipulation of the People. Defendant's Exhibit A is a memorandum of law. Defendant's Exhibit B is a certificate of completion relating to a Low Risk Substance Abuse Program. Defendant's Exhibit C is a certificate of completion relating to a Low Risk Case Plan Thinking for Change program. Defendant's Exhibit D is a second copy of Defendant's Exhibit B. Defendant's Exhibit E is a certificate of completion relating to a Powered Industrial Lift Operator program. Defendant's Exhibit F is a character letter from a Justin Ure, Sr. Defendant's Exhibit G is a copy of a January 23, 2025 letter from SORA-Counsel. 
The People did not call any witnesses to testify at the hearing, nor did the defendant. The defendant himself did not testify. The People sought the assignment of points under risk factors 1-5, 7, 11 and 13. The defendant did not oppose the assignment of points under risk factors 2-5. The defendant did, however, oppose the assignment of points under risk factors 1, 7, 11, and 13. The People also argued for an upward departure, which the defendant opposed. The defendant then argued for a downward departure, which the People opposed. Finally, the parties were afforded time subsequent to the hearing to submit memoranda of law regarding the defendant's designation, if any. SORA-Counsel filed their memorandum on April 4, 2025. The People filed their memorandum on April 11, 2025. RISK ASSESSMENT FINDINGS OF FACT
The BESO was established pursuant to New York State Correction Law § 168-l. Correction Law § 168-l(5) authorizes the BESO to "develop guidelines and procedures to assess the risk of a repeat offense . . . and the threat posed to the public safety." As a result, a "Risk Assessment Instrument," or scorecard, was developed to determine sex offenders' level of risk objectively and uniformly. This Court finds that the RAI achieves the statutory mandate of providing "guidelines and procedures." In addition, it affords each sex offender in the state the same criteria for risk assessment regardless of which judge, in which county, or in which year an assessment is made. Furthermore, were the Court to utilize any other method to determine the defendant's risk level it would deprive both the defendant and the People of equal protection under the law as both objectivity and uniformity would be dubious. Thus, the RAI is the proper method to assess a defendant's risk level. The Court, however, must independently review and assign a score for each risk factor and, where appropriate, assign a risk score which varies from the BESO's recommendation. Furthermore, where the Court determines that there is an aggravating or mitigating factor "of a kind or to a degree, not otherwise adequately taken into account by the risk assessment guidelines" the Court can depart from the risk level indicated by the guidelines. People v. Mount, 17 AD3d 714 (3rd Dept. 2005). 
With respect to the specific risk factors listed within the SORA RAI, the Court finds as follows:
Risk Factor One — Use of Violence:
The BESO presumptively assessed the defendant 10 points under this risk factor for use of forcible compulsion. As early as January 15, 2025, however, the People advised this Court and SORA-Counsel that while they agreed that 10 points should minimally be assigned due to the defendant's use of forcible compulsion, they were alternatively seeking the assignment of 15 points under this risk factor for the defendant inflicting physical injury upon one of his victims. At the hearing SORA-Counsel did not dispute the BESO's assignment of 10 points under this risk factor for the defendant's use of forcible compulsion, but SORA-Counsel did oppose the assignment of 15 points based upon the infliction of physical injury theory. "The guidelines . . . assess[] an offender 30 points if he was armed with a dangerous instrument; 15 points if he inflicted physical injury; and 10 points if he used forcible compulsion." SORA Risk Assessment Guidelines and Commentary, 2006, pg. 7. "To avoid ambiguity, the guidelines use terms that are defined in the Penal Law. Forcible compulsion means to compel by either '(a) use of physical force or (b) a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself, or another person, or in fear that he, she or another person will immediately be kidnapped.'" Id. at 8. "Discrepancies in age, size, or strength are relevant factors in determining whether there was such compulsion." Id. "Physical injury means 'impairment of physical condition or substantial pain.'" Id. 
The People argued that the assignment of 15 points under this risk factor was proper in that the defendant caused physical injury to J.L.L. in the form of substantial pain. In support of this assertion the People directed the Court to the BESO Case Summary wherein the last sexual encounter the defendant engaged in with J.L.L. is detailed. People's Exhibit 1, pg. 7. Within that Case Summary it is stated that the defendant:
" . . . closed the camper door and pushed [J.L.L.] face first against the door and stood behind her. [The defendant] then pulled down her pants and underwear and forcefully inserted his penis into her body. [J.L.L.] believed [the defendant] put his penis into her anus, because it was very painful and afterward, when [the defendant] pulled out, it made [J.L.L.] feel like she had to 'poop.' [J.L.L.] indicated that [the defendant's] penis stayed in her body for 60 to 90 seconds without motion. [J.L.L.] reported that she was in so much pain that she tried to scream, but [the defendant] put his hand over [J.L.L.'s] mouth to muffle her cries." 
Id. This account by J.L.L. is further documented within the factual section of the Amended Criminal Complaint pertaining to Counts 1-3 (People's Exhibit 1, pgs. 22-23), the Jefferson County Sheriff's Office Offense Report dated March 3, 2014 (People's Exhibit 1, pg. 46), the Jefferson County Sheriff's Office Supplemental Report of Detective Leah Meyer dated March 6, 2014 (People's Exhibit 1, pg. 53), the Jefferson County Sheriff's Office Supplemental Report dated March 13, 2014 (People's Exhibit 1, pg. 62), and the Probable Cause Statement and Judicial Determination (People's Exhibit 1, pgs. 134-135). During the defendant's plea colloquy he was specifically asked if the "facts that are set out in [the] amended complaint [are] true and correct," and the defendant indicated, "yes." People's Exhibit 2, pgs. 8-9. Those facts, which the defendant acknowledged were true and correct, included the factual assertion that the defendant engaged in forcible anal sexual intercourse with J.L.L. wherein she was subjected to substantial pain (i.e., physical injury) People's Exhibit 1, pg. 23. Through the foregoing exhibits the People have proven by clear and convincing evidence that the assignment of 15 points under this risk factor is proper based upon the defendant inflicting physical injury upon J.L.L. in the form of substantial pain. See People v. Kruger, 88 AD3d 1169, 1170 (3rd Dept. 2011); People v. [*4]Garofalo, 195 AD3d 958, 960 (2nd Dept. 2021). 

In the event that this Court did not assign 15 points under this risk factor, 10 points would have otherwise been assigned due to the defendant's use of forcible compulsion against J.L.L. during the anal sexual intercourse above described, as well as the forcible compulsion exhibited during golf cart rides when the defendant used force to place J.L.L.'s hand on his penis. People's Exhibit 1; People's Exhibit 2. The defendant did not contest the assignment of 10 points on the theory that he exerted forcible compulsion upon J.L.L. Thus, clear and convincing evidence also supported the assignment of 10 points under this risk factor. 
Therefore, the assignment of points is proper, and the Court assigns the defendant 15 points under this risk factor.
Risk Factor Two — Sexual Contact with Victim:
The BESO presumptively assessed the defendant 25 points under this risk factor for sexual intercourse, deviate sexual intercourse, or aggravated sexual abuse. The People agreed that 25 points should be assigned under this risk factor. The defendant did not oppose the assignment of 25 points under this risk factor. 
The Guidelines explain that 25 points should be assigned under this risk factor when the defendant subjects the victim to "sexual intercourse, oral sexual conduct, anal sexual conduct or aggravated sexual abuse as defined in Penal Law Article 130." SORA Risk Assessment Guidelines and Commentary, 2006, pg. 9. Indeed, the defendant's crimes of conviction verily support the assignment of points under this risk factor. See People's Exhibit 1, pgs. 6-7, 21-29, 46, 53-54, 62, 111, 134-135, 204-206; see also People's Exhibit 2.
Accordingly, based upon the uncontroverted evidence received at the hearing, and upon the consent of the defendant, the Court finds that the People have satisfied their burden of proving, by clear and convincing evidence, that the defendant subjected J.L.L. anal sexual intercourse and C.S. to oral sexual conduct and vaginal sexual intercourse. Therefore, the Court assigns the defendant 25 points under this risk factor.
Risk Factor Three — Number of Victims:
The BESO presumptively assessed the defendant 20 points under this risk factor for the defendant's victimization of two victims. The People agreed that 20 points should be assigned under this risk factor. The defendant did not oppose the assignment of 20 points under this risk factor. 
"The Guidelines assess 20 points if there were two victims . . . " SORA Risk Assessment Guidelines and Commentary, 2006, pg. 10. "This category focuses upon the number of people whom the offender victimized in the case (or cases) that ultimately resulted in the instant conviction." Id. "The existence of multiple victims is indicative of compulsive behavior and is, therefore, a significant factor in assessing the offender's risk of reoffense and dangerousness." Id. (Internal citation omitted). "[A] court's review of the evidence regarding the number of victims is not limited to the crime[] of conviction, and the People may use reliable hearsay, including a case summary and presentence investigation report [], to establish the number of victims for SORA purposes." People v. Hyman, 228 AD3d 1080, 1081 (3rd Dept. 2024) (Internal citations omitted). 
Under this risk factor the People are alleging that the defendant victimized J.L.L. and C.S. The crimes of conviction in this case, as supplemented by the reliable hearsay evidence contained within People's Exhibits 1 and 2, well establish by clear and convincing evidence that J.L.L. and C.S. are identified victims of the defendant's sexual misconduct in this matter. The [*5]defendant did not dispute that both J.L.L. and C.S. are identified victims in this case, nor did the defendant dispute that the assignment of 20 points under this risk factor was proper.
Accordingly, based upon the uncontroverted evidence received at the hearing the Court finds that the People have satisfied their burden of proving, by clear and convincing evidence, that the defendant victimized two separate minor victims in the instant case. Therefore, the Court assigns the defendant 20 points under this risk factor.
Risk Factor Four — Duration of Offense Conduct with Victim:
The BESO presumptively assessed the defendant 20 points under this risk factor for engaging in a continuing course of sexual misconduct. The People agreed that 20 points should be assigned under this risk factor. The defendant did not oppose the assignment of 20 points under this risk factor. 
"This category is designed to reflect the fact that some offenders, particularly those who prey on young children, manifest their compulsive behavior by engaging in a continuing course of sexual contact with the same victim." SORA Risk Assessment Guidelines and Commentary, 2006, pg. 10. "The offender who sexually abuses his girlfriend's young daughter over a period of several weeks falls into this 20-point category." Id. "The Board opted for a definition of continuing course of sexual contact that includes both the nature and length of the offender's conduct." Id. "For purposes of these guidelines an offender has engaged in a continuing course of sexual contact when he engages in either (i) two or more acts of sexual contact, at least one of which is an act of sexual intercourse, oral sexual conduct, anal sexual conduct, or aggravated sexual contact, which acts are separated in time by at least 24 hours, or (ii) three or more acts of sexual contact over a period of at least two weeks." Id. "'Sexual contact' means any touching of the sexual or other intimate parts of a person for the purpose of gratifying [the] sexual desire of either party. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed." Penal Law § 130.00(3). 
In the instant matter the defendant plead guilty to Engaging in Repeated Acts of Sexual Assault of the Same Child in violation of Wisconsin Statute § 948.025(1)(e) as it pertained to J.L.L., and Exposing Genitals or Pubic Area in violation of Wisconsin Statute § 948.10(1)(a) and Sexual Intercourse with a Child Aged 16 or Older in violation of Wisconsin Statute § 948.09 as it pertained to C.S. People's Exhibit 1, pgs. 6-9, 21-29, 236-245; People's Exhibit 2. Specific to J.L.L., the hearing evidence established that the defendant made J.L.L. touch his penis, both over and under his clothes, on three or four occasions over the course of the Summer of 2012. People's Exhibit 1, pgs. 6-7, 21-29, 46, 50, 51-52, 77, 111, 134-135, 169, 214, Video File VTL_01_2; People's Exhibit 2. The defendant also admitted to rubbing his hand over J.L.L.'s vaginal area over her clothes. Id. at 7, 21-29, 46, 77, 169, 214, Video File VTL_01_2; People's Exhibit 2. The defendant also engaged J.L.L. in anal sexual intercourse toward the end of the Summer of 2012. Id. at 7, 21-29, 46, 53, 62, 111, 134; People's Exhibit 2, pgs. 8-9. With respect to C.S., the defendant had her give him oral sex, and thereafter on approximately 5-8 occasions, which C.S. reported occurred on a weekly basis, the defendant engaged in vaginal sexual intercourse with C.S. Id. at 7, 21-29, 204-206, C.S. Video Interview; People's Exhibit 2, pgs. 8-9.
Accordingly, based upon the uncontroverted evidence cited by the People, the Court finds that the People have satisfied their burden of proving, by clear and convincing evidence, that the duration of the defendant's offensive conduct with each victim, J.L.L. and C.S., was a [*6]continuing course of sexual misconduct. Therefore, the Court assigns the defendant 20 points under this risk factor.
Risk Factor Five — Age of Victim:
The BESO presumptively assessed the defendant 20 points under this risk factor for victimizing a child age 11 — 16 years old. The People agreed that 20 points should be assigned under this risk factor. The defendant did not oppose the assignment of 20 points under this risk factor. 
This Court observes that the Guidelines "assess 20 points if the victim was 11 through 16 years old..." SORA Risk Assessment Guidelines and Commentary, 2006, pg. 11. People's Exhibits 1 and 2 well establish by clear and convincing evidence that J.L.L. was born in 1998 and C.S. was born in 1996, resulting in them being 14 and 16 years old, respectively, at the time of their victimization in 2012. 
Accordingly, based upon the uncontroverted evidence cited by the People, the Court finds that the People have satisfied their burden of proving, by clear and convincing evidence, that both of the defendant's victims in this matter were age 11 through 16 at the time of their victimization. Therefore, Court assigns the defendant 20 points under this risk factor.
Risk Factor Six — Other Victim Characteristics:
No points are being assigned under this risk factor.
Risk Factor Seven — Relationship with Victim:
Although the BESO did not assign the defendant any points under this risk factor, the People advised this Court and the defendant as early as January 15, 2025, that they were seeking the assignment of 20 points under this risk factor. People's Exhibit 1. "The Guidelines assess 20 points if the offender's crime (i) was directed at a stranger or a person with whom a relationship had been established or promoted for the primary purpose of victimization or (ii) arose in the context of a professional or avocational relationship between the offender and the victim and was an abuse of such relationship." SORA Risk Assessment Guidelines and Commentary, 2006, pg. 12. "The phrase 'established or promoted for the primary purpose of victimization' is adopted from the Act itself (Correction Law § 168-a[9])." Id. "An uncle who offends against his niece generally would not fall into this category." Id. "A scout leader who chooses his profession or vocation to gain access to victims and 'grooms' his victims before sexually abusing them would qualify." Id. The People have argued that the assignment of points under this risk factor is appropriate upon the theory that the defendant established his relationships with J.L.L. and C.S. for the primary purpose of victimization. People's Exhibit 1. 
With respect to J.L.L., the hearing evidence revealed that she and the defendant first met during the Summer of 2012 at the R.B.R. campground when J.L.L. was 14 years old. Id. at 1, 6, 46, 50, Video File VTL_01_2. On the very first occasion that J.L.L. and the defendant met in the Summer of 2012 the defendant touched her inappropriately during a hug. Id. at 46, 50, 111. J.L.L. was giving everyone around the campsite a hug goodnight and during that hug the defendant touched her buttocks. Id. J.L.L. thought that the inappropriate touching was accidental but the defendant's sexual misconduct toward her only continued after that very first meeting. Id. at 50, 111. The very next weekend that J.L.L. and her family were staying at the campground the defendant grabbed J.L.L.'s buttocks and held his hand there for approximately 5 seconds, after which the defendant rubbed J.L.L.'s back. Id. at 46, 51, 111. The defendant's hand only lost contact with J.L.L.'s buttocks because J.L.L. moved away from the defendant. Id. at 51. After that second incident the defendant's sexual misconduct graduated to taking J.L.L.'s [*7]hand and placing it on his penis over his clothing during rides on his golf cart. Id. at 6, 22, 51, 77, 111, 134-135, 169, 214, 243-244. The defendant then moved J.L.L.'s hand in an up and down motion on his penis. Id. at 6, 22-23, 51, 77, 134, 169, 214, 243. J.L.L. estimated that this type of sexual misconduct on the golf cart occurred 3-4 times during the Summer of 2012. Id. at 6, 22-23, 51, 111, 135, 244. During this manual stimulation the defendant would ask J.L.L. if she "liked it." If J.L.L. tried to pull her hand away the defendant would overpower her and hold her hand there on his penis. Id. at 51, 111. On another occasion on the defendant's golf cart the defendant withdrew his penis from the fly of his pants such that J.L.L. was able to see the defendant's erect penis. Id. at 23, 46, 52, 77, 111, 134-135, 169, 214, 244. The defendant then took J.L.L.'s hand and placed it on his erect exposed penis and moved it in an up and down manner. Id. at 23, 52, 134, 169, 214. During this contact the defendant asked J.L.L. if she liked his "big, hard cock." J.L.L. estimated that this contact with the defendant's penis lasted a few minutes. Id. at 52. When J.L.L. was asked why she failed to report this sexual misconduct J.L.L. explained that the defendant told her keep her mouth shut or he would kill her. Id. at 6, 23, 52, 62, 111, 134, 244. On another occasion while walking between two campsites the defendant grabbed J.L.L. by the waist, pulled her to him, and kissed her on the mouth. Id. at 52, 111. J.L.L. advised law enforcement that the defendant frequently made comments to her about how beautiful she was. Id. at 53. J.L.L. also recounted another occasion when the defendant grabbed her buttocks and told her to "behave." Id. at 53, 111. The final incident between the defendant and J.L.L. occurred inside the defendant's camper when the defendant pushed J.L.L. up against the door, pulled J.L.L.'s pants and underwear down, took his penis out and then inserted his penis into J.L.L. Id. at 6-7, 23, 46, 53, 62, 111, 134, 244. J.L.L. believed that the defendant's penis entered her anus given the pain associated with the sexual assault and the way her rectum felt afterwards. Id. J.L.L. believed that if the defendant had not entered her anus that he had otherwise entered her vagina. Id. at 6-7, 53. Again, the defendant admitted during his plea colloquy that the facts that were set out within the Amended Criminal Complaint were true and correct. People's Exhibit 2, pgs. 8-9. 
A reasonable view of the evidence establishes that the defendant, who was 35 years old at the time of J.L.L.'s victimization in 2012, began touching J.L.L. inappropriately from the very first time they met, and that his sexual misconduct toward J.L.L. continued and escalated in severity over the course of that Summer. By all accounts, the defendant victimized J.L.L. on what appears to be nearly every weekend her family visited the campground. The only reasonable conclusion that can be reached in this matter based upon the evidence is that the defendant established and maintained this relationship with J.L.L. for the purpose of his sexual victimization of her. This is particularly so given the defendant's persistent victimization of J.L.L., who he knew was underage, coupled with his self-disclosed penchant for teenage girls that Summer. Id. at 7, 23, 77, 135, 169, 214, 244, Video File VTL_01_2. See People v. Jony, 219 AD3d 1438, 1439 (2nd Dept. 2023); People v. Burrowes, 177 AD3d 1005, 1006-1007 (2nd Dept. 2019); People v. Green, 201 AD3d 1137, 1138-1139 (3rd Dept. 2022). 
With respect to C.S., the hearing evidence established that C.S. was a foster child staying with her foster parents at the R.B.R. campground during the Summer of 2012. People's Exhibit 1, pgs. 7, 23, 74, 135, 166, 201, 211, 244-245, Video File VTL_01_1. During the Summer of 2012 C.S. was 16 years old. Id. at 7, 23, 74, 135, 166, 203, 244, Video File VTL_01_2. During an interview with law enforcement C.S. disclosed that at first the defendant flirted with her and called her "trouble" due to the fact that she was required to wear an ankle monitor that Summer. [*8]Id. at 7, 23, 204, 244. C.S. further disclosed that on an evening in the second week of July 2012 the defendant asked her to stop and talk to him when she was walking by his campsite. C.S. did stop and speak with the defendant. The defendant, who smelled of alcohol, then led C.S. into the darkness behind his camper, unzipped his pants, and took his penis out. Id. at 7, 23, 204, 244. C.S. observed that the defendant's penis was exposed and erect. Id. at 7, 23, 204, 244. C.S. then knelt down and gave the defendant oral sex. Id. at 7, 23, 204, 206, 244. C.S. explained that after this incident of oral sex, sexual activity between the defendant and C.S. thereafter occurred weekly. Id. at 7, 23, 135, 204, 244-245, C.S. Video Interview. C.S. estimated that she and the defendant engaged in vaginal sexual intercourse approximately 5-8 times subsequent to the incident in which she gave him oral sex. Id. at 7, 24, 204, 245, C.S. Video Interview. C.S. stated that they first engaged in sexual intercourse approximately a few days to one week after the incident of oral sex. Id. at 24, 204, 245, C.S. Video Interview. Each time they had sex it occurred within the defendant's trailer. Id. at 24, 204, 245, C.S. Video Interview. The sex typically occurred during the day when the defendant's son was not present, but on one occasion it occurred late at night when the defendant's son was asleep. Id. at 24, 204, 245, C.S. Video Interview. Typically, the defendant and C.S. had sex standing up in the kitchen so as to make sure they were not interrupted. Id. at 24, 205, 245, C.S. Video Interview. Upon recollection, C.S. approximated that her sexual contact with the defendant began in the beginning of July 2012 and continued through the first week of August 2012. Id. at 7, 24, 206, 245, C.S. Video Interview. During that approximate 1-month time frame was when they engaged in the single incident of oral sex and the 5-8 incidents of vaginal sexual intercourse. Id. at 7, 24, 206, 245, C.S. Video Interview. The defendant admitted the accuracy of many of these facts during his plea colloquy when he acknowledged that the Amended Criminal Complaint was factually accurate. People's Exhibit 2, pgs. 8-9. 
A reasonable view of the evidence establishes that the defendant, who was 35 years old at the time of C.S.'s victimization in 2012, initiated a sexual relationship with 16-year old C.S. It is undisputed that C.S. was a vulnerable child hailing from a tumultuous foster family situation during the Summer of 2012. The hearing evidence established that at the beginning of the Summer of 2012 the defendant started out by making flirtatious comments toward C.S. The defendant's behavior then escalated late one evening in the beginning of July 2012 when the defendant asked C.S. to stop when she was walking past his campsite. When C.S. did as the defendant asked of her he then led her into the darkness behind his camper where he unzipped his pants and exposed his erect penis to her. While the record is also undisputed that the defendant did not then verbally request C.S. to perform oral sex on him, nor did he exert physical force upon her in order to get her to perform oral sex on him, this Court as the finder of fact can rationally conclude that such oral sex is what the defendant was requesting by pulling her into the shadows and withdrawing his erect penis. Further, while the evidence established that C.S. initiated vaginal sexual intercourse between them when the defendant and C.S. were together and alone within his camper, this risk factor narrowly focuses upon the nature and rationale for the relationship established between offender and victim. It is of no consequence that when the defendant, a grown man and father, was alone inside his camper with a 16-year old foster child that she initiated the sexual intercourse. The fact remains, and this Court concludes, that given the defendant's sexual overtures lobbed at C.S. from the outset of their relationship, progressing to the defendant bringing her aside and presenting his penis to her for oral sex, and then the defendant maintaining this relationship with C.S. and engaging in sexual intercourse [*9]thereafter, that the defendant established and then maintained this relationship with C.S. for the purpose of his sexual victimization of her. See People v. Jony, 219 AD3d 1438, 1439 (2nd Dept. 2023); People v. Burrowes, 177 AD3d 1005, 1006-1007 (2nd Dept. 2019); People v. Green, 201 AD3d 1137, 1138-1139 (3rd Dept. 2022). 
Accordingly, the Court finds that the People have satisfied their burden of proving, by clear and convincing evidence, that the defendant established a relationship with J.L.L. and C.S. for the purpose of victimizing each of them. Therefore, the assignment of points is proper, and the Court assigns the defendant 20 points under this risk factor.
Risk Factor Eight — Age at First Sex Crime:
No points are being assigned under this risk factor.
Risk Factor Nine — Number and Nature of Prior Crimes:
No points are being assigned under this risk factor.
Risk Factor Ten — Recency of Prior Felony or Sex Crime:
No points are being assigned under this risk factor.
Risk Factor Eleven — Drug or Alcohol Abuse:
Although the BESO did not assign the defendant any points under this risk factor, the People advised this Court and the defendant as early as January 15, 2025, that they were seeking the assignment of 15 points under this risk factor. People's Exhibit 1. The Guidelines assess 15 points "if an offender has a substance abuse history or was abusing drugs and or alcohol at the time of the offense." SORA Risk Assessment Guidelines and Commentary, 2006, pg. 15. "The category focuses on the offender's history of abuse and the circumstances at the time of the offense." Id. "It is not meant to include occasional social drinking." Id. 
In support of the assignment of points under this risk factor the People have directed the Court to the fact that each of the victims, J.L.L. and C.S., described instances when the defendant was inappropriate with them when they believed him to be under the influence of alcohol. J.L.L. described an incident during the Summer of 2012 when she and the defendant were walking between two campsites and the defendant grabbed her around the waist, pulled her close to him, and kissed her on the lips. People's Exhibit 1, pg. 52. J.L.L. stated that when the defendant did that she observed the strong odor of alcohol on his breath, and also observed that the defendant was slurring his speech. Id. J.L.L. further recounted how the defendant "almost always was drinking at the campground in the evenings. He typically started consuming alcohol in the afternoon and continued doing so into the evening." Id. at 54. 
When describing her sexual interactions with the defendant C.S. indicated that on the occasion when the defendant stopped her and brought her behind his camper for oral sex she observed that he was intoxicated based upon the fact that the defendant exhibited slurred speech, stumbling, and he smelled of beer. Id. at 204, 244. The defendant's own statements provide a sufficient foundation to believe that C.S. was capable of making such an observation regarding the defendant's intoxication given the fact that the defendant disclosed to law enforcement [*10]authorities that C.S. "hated her foster parents because they were always drinking alcohol." Id. at 74, 166, 202, 211, Video File VTL_01_1, Video File VTL_01_2. 
The defendant himself also disclosed a history of consumption of alcohol during the Summer of 2012 when these crimes were committed. When speaking to law enforcement the defendant acknowledged "frequently drinking alcohol when staying at the campground and in his words he used to 'cut loose' when staying there." Id. at 75, 167, 212. The defendant disclosed that on "1-2 occasions he became extremely intoxicated that summer and passed out." Id. at 75, 167, 212. The investigating officer also asked the defendant "if he ever drinks so much alcohol that he forgets things than happen and [the defendant] responded, 'I suppose.'" Id. at 77, 169, 214, Video File VTL_01_2. With respect to his inappropriate sexual behavior toward J.L.L., the defendant indicated that when those instances occurred "he'd been drinking but wasn't drunk." Id. at 214, Video File VTL_01_2. While in prison the defendant reported that his alcohol use had increased during the Summer of 2012 and reported drinking when the sexual assaults occurred. People's Exhibit 3, pgs. 17, 38. The Wisconsin DOC further noted the defendant to have a "[h]istory of alcohol and drug use." Id. at 27, 29, 31. The defendant further advised DOC officials that "he was intoxicated while engaging in groping and fondling actions with the 14-year-old on the golf cart." Id. at 30, 37, 38. "He noted that this intoxication does not excuse his actions, though he feels that he should address this issue while completing SOT." Id. 
The transcript of the defendant's plea and sentence also supports a finding that the defendant's alcohol abuse during the Summer of 2012 played a role in the commission of these offenses. Initially, the defendant's attorney referenced the defendant's "moral compass" being thrown out of "whack" through drinking at the campground. People's Exhibit 2, pg. 18. Later on, the defendant's attorney stated that the defendant himself described his time at the campground as a "drunk fest," and his attorney noted that the defendant "probably should not have been drinking as heavily as we was . . . " Id. at 22. Finally, the sentencing judge noted that "[a]lcohol likely played an impact," and stated that "it's important that Mr. O'Keefe not fall back into that pattern again." Id. at 28. 
While this Court commends the defendant for his completion of the Low Risk Substance Abuse Program (see Defendant's Exhibits B and D), the completion of this program alone is insufficient to overcome the assignment of points under this risk factor given that the defendant has not been out of prison and in the community long enough to establish a more recent history of voluntary abstinence. While he likely abstained from alcohol consumption while in prison, such abstinence, if any, is more likely due to his institutional confinement than through a voluntary exercise of free will. 
Accordingly, the Court finds that the People have satisfied their burden of proving, by clear and convincing evidence, that the defendant abused alcohol during the Summer of 2012 and that such alcohol abuse played a role in his victimization of J.L.L. and C.S. Therefore, the assignment of points is proper, and the Court assigns the defendant 15 points under this risk factor.
Risk Factor Twelve — Acceptance of Responsibility:
No points are being assigned under this risk factor.
Risk Factor Thirteen — Conduct While Confined/Supervised:
Although the BESO did not assign the defendant any points under this risk factor, the People advised the Court and the defendant on March 10, 2025 that they were seeking the assignment of 10 points under this risk factor. 
The SORA Guidelines explain that this risk factor "looks to the offender's conduct while in custody or under supervision as a predictor of future behavior." SORA Risk Assessment Guidelines and Commentary 2006, pg. 16. "[A]n offender who has numerous citations for disciplinary violations or who accrues disciplinary dispositions of a serious nature or who receives dispositions for behavior such as attempting to contact the victim may be assessed points in this category." Id. "An offender who has incurred serious disciplinary violations in prison poses a heightened risk of recidivism: his misconduct bodes ill for his return to the streets." Id. "An offender's adjustment to confinement in prison also is unsatisfactory if he has a recent Tier Three disciplinary violation." Id. In such instances the Guidelines assess an offender 10 points for such unsatisfactory adjustment to prison. Id. 
While in Wisconsin DOC the defendant accrued two minor disciplinary infractions and one major disciplinary infraction. The defendant violated DOC rules as recently as March 25, 2024, which was approximately 6 months prior to his release from prison. In that incident the defendant attempted to smuggle an auxiliary power cord back into his unit by hiding it within a coffee maker which he had been working on. People's Exhibit 3, pgs, 2-4. While this incident was reported as a major incident with potential to create a risk of serious disruption at the facility or community, the incident was ultimately resolved as a minor disposition. Id. at 2-4, 8, 10-11. On April 29, 2020, the defendant was found in possession of another incarcerated individual's property, namely a bottle of Nair hair remover. Id. at 5. This incident was noted as a minor disposition. Id. On April 14, 2020, the defendant was involved in an altercation with another incarcerated individual during which the defendant grabbed a piece of metal which was determined to be 33 inches long, 4 inches wide, and ¼ of an inch thick and was holding it at chest level while coming toward another incarcerated individual and shaking the metal stick at him. Id. at 6-7, 16. The piece of metal was determined to be a cutting edge used in the sign making area of the prison facility. Id. at 6. This incident was captured on video and the defendant admitted to engaging in this conduct. Id. This incident was reported as a major incident with potential risk of serious disruption at the facility or community and risk of serious injury to another person. Id. This case was resolved by way of a major disposition. Id. at 7, 9. 
The defendant has opposed the assignment of points under this risk factor arguing that despite the defendant's disciplinary infractions the BESO found the defendant's behavior in prison to be "satisfactory," as well as the fact that while in prison the defendant completed various programs. See Defendant's Exhibits A-E. A careful review of the BESO's Case Summary, however, reveals that the BESO deemed the defendant's conduct while confined to be satisfactory simply and solely because it was not in receipt of any conduct reports regarding the defendant's time in prison. The BESO's rendering of a "satisfactory" determination based upon no information at all illustrates the problems inherent in the transfer of sex offender registration across state lines. 
This Court does not agree with the BESO that the defendant's commission of two minor disciplinary dispositions and one major disciplinary disposition while in prison is acceptable nor satisfactory behavior. While there is no particular number or type of disciplinary violations necessary for the assignment of points under this risk factor, this Court finds particularly probative the nature of the disciplinary infractions and how recently they occurred prior to the [*11]defendant's release to community supervision. In this matter the defendant was sentenced on December 16, 2014, and did not have any reported disciplinary violations until 2020. Interestingly, the defendant's programmatic achievements which SORA-Counsel points to in support of the non-assignment of points under this risk factor all pre-dated the defendant's disciplinary troubles. The defendant's first disciplinary violation was a major one, which this Court finds aligns with what New York State DOCCS would term a Tier III violation, and consisted of possessing a nearly 3-foot long metal cutting edge and advancing toward another incarcerated individual and menacing him with the same. Very shortly after that serious violation the defendant was found to be in possession of property belonging to another incarcerated individual. While this minor possession of a bottle of hair remover is, in and of itself, of little concern, the fact that the defendant would find himself again violating prison rules so soon after menacing another incarcerated individual with a metal cutting edge gives this Court pause. Finally, the defendant's last disciplinary violation occurred approximately 6-months before his release to community supervision, and while it ultimately resolved by way of a minor disposition, while pending it was categorized as a major violation. When considering the defendant's prison disciplinary history under this lens, this Court cannot conclude that the defendant's conduct while confined was satisfactory. 
Accordingly, this Court finds that the People have satisfied their burden of proving, by clear and convincing evidence, that the defendant's conduct while confined was unsatisfactory. See People v. Williams, 100 AD3d 610, 611 (2nd Dept. 2012)("The defendant's unsatisfactory conduct during his incarceration was established by the case summary, which revealed that he recently committed a Tier III disciplinary violation."); People v. Mabee, 69 AD3d 820, 821 (2nd Dept. 2010)("The defendant's unsatisfactory conduct during his incarceration was established by the case summary, which revealed his recent commission of a Tier III disciplinary violation."). Therefore, the assignment of these points is proper, and the Court assigns the defendant 10 points under this risk factor.
Risk Factor Fourteen — Supervision:
No points are being assigned under this risk factor.
Risk Factor Fifteen — Living/Employment Situation:
No points are being assigned under this risk factor.
Total Score on Risk Assessment Instruction:
Based upon the foregoing determinations, the defendant's total risk factor score is 145 points, which corresponds to a Level 3 sex offender categorization. 

Upward/Downward Departure
In the event the defendant was not presumptively scored a Level 3 offender, the People requested an upward departure. Additionally, in the event that the defendant were presumptively scored a Level 2 or Level 3 offender, SORA-Counsel has requested a downward departure. "The ability to depart is premised on a recognition that an objective instrument, no matter how well [*12]designed, will not fully capture the nuances of every case." SORA Risk Assessment Guidelines and Commentary, 2006, pg. 4. "Generally, the Board or a court may not depart from the presumptive risk level unless it concludes that there exists an aggravating or mitigating factor of a kind, or to a degree, that is otherwise not adequately taken into account by the guidelines." Id. (internal citation omitted).
In People v. Gillotti, 23 NY3d 841 (2014), the Court of Appeals laid out an analytical framework for the courts to use in determining whether to grant a request for a departure. The Court explained that "[u]nder SORA, a court must follow three analytical steps to determine whether or not to order a departure from the presumptive risk level indicated by the offender's guidelines factor score." Id. at 861. "At the first step, the court must decide whether the aggravating or mitigating circumstances alleged by a party seeking a departure are, as a matter of law, of a kind or to a degree not adequately taken into account by the guidelines." Id. (Internal citations omitted). "At the second step, the court must decide whether the party requesting the departure has adduced sufficient evidence to meet its burden of proof in establishing that the alleged aggravating or mitigating circumstances actually exist in the case at hand." Id. (Internal citations omitted). "If the party applying for a departure surmounts the first two steps, the law permits a departure, but the court still has discretion to refuse to depart or to grant a departure." Id. "Thus, at the third step, the court must exercise its discretion by weighing the aggravating and mitigating factors to determine whether the totality of the circumstances warrants a departure to avoid an over- or under-assessment of the defendant's dangerousness and risk of sexual recidivism." Id. (Internal citations omitted). "The People cannot obtain an upward departure pursuant to the guidelines unless they prove the existence of certain aggravating circumstances by clear and convincing evidence." Id. at 862. However, "a defendant must prove the existence of the mitigating circumstances upon which he or she relies in advocating for a departure by a mere preponderance of the evidence." Id. at 864. "[A]n appropriate aggravating factor is one which tends to establish a higher likelihood of reoffense or danger to the community, and an appropriate mitigating factor is one which tends to establish a lower likelihood of reoffense or danger to the community than the presumptive risk level calculated on the RAI." People v. Wyatt, 89 AD3d 112, 121 (2nd Dept. 2011). "Where the alleged factor is taken into account by the Guidelines, or is not related to the risk of reoffense and danger to the community, as a matter of law a departure is not warranted." Id.
Upward Departure
Within their January 15, 2025 submission (i.e., People's Exhibit 1), the People argued that in the event the defendant was not presumptively scored a Level 3 offender this Court should grant an upward departure to a Level 3 based upon the fact that risk factors 2, 4, and 5 do not adequately take into consideration the defendant's continuing course of sexual misconduct against two separate victims age 11 through 16. More specifically, the People's argument is that under risk factor 2, 25 points were assignable as it pertained to J.L.L. for deviate sexual intercourse, and also separately as it pertained to sexual intercourse with C.S., yet the RAI does not double the assignable points under such a scenario. That same argument applies to risk factor 4 in which points were assignable due to the defendant's continuing course of sexual misconduct toward both J.L.L. and C.S., and risk factor 5 in which the defendant separately victimized both J.L.L., who was 14 years old, and C.S., who was 16 years old, yet only a single [*13]assignment of points is permissible under each such risk factor on the RAI. 
In support of their request for an upward departure on this basis the People have referred the Court to People v. Garrison, 38 AD3d 1099, 1100 (3rd Dept. 2007). In that case there were three minor victims and while additional points for multiple victims was assigned under risk factor 3, the Third Department affirmed an upward departure from a Level 2 to a Level 3 on the ground that "neither category 4 nor category 5 includes additional points for the continuing sexual misconduct of multiple victims who are underage." Id. See also People v. Clark, 169 AD3d 836, 837 (2nd Dept. 2019)(" . . . although the defendant was assessed points under risk factor 3 for having three or more victims, this does not fully account for the fact that he communicated with and sent explicit photos to at least 25 minors using an instant messenger application."). 
Accordingly, this Court finds that the People have satisfied the first step of the Gillotti analysis by identifying an aggravating circumstance which, as a matter of law, is not adequately taken into account by the RAI. Further, based upon the proof cited above within this Court's discussion of risk factors 2, 4, and 5, this Court finds that the People have proven the existence of this aggravating circumstance by clear and convincing evidence. Finally, in this Court's exercise of discretion, this Court finds that were the defendant not already presumptively assessed a Level 3 offender this Court would grant the People's request for an upward departure from a Level 2 to a Level 3 in order to avoid an under-assessment of the defendant's dangerousness and risk of sexual recidivism. 
The People also sought an upward departure upon the ground that the defendant's convictions for separate crimes against separate victims wherein consecutive sentences were imposed justifies such departure. In support of that assertion the People referred the Court to People v. Miller, 149 AD3d 1279 (3rd Dept. 2017). A review of that case reveals that an upward departure on this ground is not warranted, as the first step of the Gillotti analysis cannot be substantiated. In Miller, the defendant was charged in two different indictments with each indictment pertaining to a distinct victim. On the same day the defendant entered a plea to a crime within each indictment and was sentenced. After a SORA hearing, the Court assigned additional points under risk factor 3 for two or more victims upon the basis that the defendant's crimes in the two indictments occurred during the same time period. The Third Department held that the assignment of such additional points was erroneous since he plead to a crime in each indictment, rather than pleading to one crime in satisfaction of both indictments, and since each indictment pertained to its own distinct victim there was only one victim in each case and additional points under risk factor 3 was not warranted. 
Applying the logic set forth within the Miller decision, the opposite conclusion is required here. Here, the defendant was charged in a single accusatory instrument with a number of offenses pertaining to two separate victims (i.e., J.L.L. and C.S.). The defendant then entered pleas on that accusatory instrument in satisfaction of the entire accusatory instrument. At the SORA hearing all parties were in agreement that additional points were properly assigned under risk factor 3 based on their being two victims in this case. In that respect, the commission of concurrent crimes against two victims theory posited by the People was sufficiency taken into consideration by risk factor 3. Accordingly, an upward departure upon a concurrency of offenses theory is not appropriate and is denied. 
Downward Departure
At the SORA hearing SORA-Counsel argued for a downward departure to either a Level 1 or Level 2 depending upon the defendant's presumptive assessment. See also Defendant's Exhibit A. Initially, SORA-Counsel, citing People v. Williams, 148 AD3d 540 (1st Dept. 2017), argued that the "court may depart from scoring points on any risk factor . . . ". In Williams, the defendant did not dispute the court's assignment of points but rather requested a downward departure. To the extent that SORA-Counsel here requests this Court to not assign points, such an argument falls outside the scope of a downward departure as it is contradictory to step one of the Gillotti analysis. This Court has considered the arguments of the parties as it pertains to the assignment of points on the RAI and has ruled on those risk factors above. Similarly, while SORA-Counsel has asserted that the defendant "intends to" make himself a productive member of his community, such fact remains to be determined given the minimal amount of time the defendant has been released to community supervision. Accordingly, while this assertion arguably satisfies step one of the Gillotti analysis, the evidence received at the hearing does not establish this assertion by a preponderance of the evidence, nor does this assertion lead this Court to believe a downward departure would be appropriate to avoid an over-assessment of the defendant's dangerousness and risk of sexual recidivism. 
SORA-Counsel's assertion that the defendant has purchased a home, has gained steady employment, and is reconnecting with his family is all contemplated by risk factor 15. Accordingly, this is not a proper basis for a downward departure as it runs afoul of step one of the Gillotti analysis. That the defendant may be participating in weekly sex offender therapy sessions, to the extent it is not already taken into consideration by the Guidelines, fails to satisfy step two of the Gillotti analysis as the defendant failed to provide any evidence supporting this assertion. Thus, it was not established by a preponderance of the evidence at the SORA hearing.
SORA-Counsel further moved for a downward departure upon the ground that the RAI does not adequately take into consideration a situation wherein "a teenage victim consented to the sexual relationship." Defendant's Exhibit A. In this regard, SORA-Counsel points to the hearing evidence which substantiates that C.S., who was 16 years old at the time of her victimization, advised law enforcement that she factually consented to engaging in all sexual activity with the defendant, who was then 35 years old. This Court finds that the defendant has satisfied the first two steps of the Gillotti analysis in this regard, however this Court does not find, based upon a totality of the circumstances, that a downward departure to a Level 2 is warranted in this case in order to avoid an over-assessment of the defendant's dangerousness and risk of sexual recidivism. While it is uncontroverted that C.S. factually consented to all sexual activity with the defendant, this Court cannot ignore the fact that the defendant initiated this sexual relationship with C.S., a minor child, during the Summer of 2012 by calling her aside and pulling out his penis in the shadows behind his camper for oral sex. As the defendant was the initiator of this sexual relationship with C.S., this Court cannot ignore the fact that the defendant selected a palpably obvious vulnerable victim and preyed upon her. C.S. was a teen foster-child living in a tent outside her foster parents' camper during the Summer of 2012. The defendant was clearly aware that she was a troubled youth by the fact that he would call her "trouble" in reference to the ankle monitor prominently displayed on her person. The nearly 20-year age gap between the defendant and C.S. also distinguishes this case from the cases cited by SORA-Counsel. Additionally, the defendant was also engaging in non-consensual sexual behavior toward J.L.L., including a forcible and painful incident of anal sexual intercourse which was recited within the Amended Criminal Complaint, and such complaint was noted by the defendant [*14]during his plea colloquy to be true and correct. Accordingly, a downward departure on this basis is denied. 
Finally, SORA-Counsel has argued that a downward departure is warranted in light of the findings on the STATIC-99 and COMPAS risk assessment tools that the defendant is of moderate risk to reoffend. Defendant's Exhibit A. New York courts have held that the "defendant's score on the Static-99 classifying him as a moderate to high risk to reoffend is not a circumstance which, standing alone, may be considered a mitigating factor." People v. Downes, 216 AD3d 1183 (2nd Dept. 2023) citing People v. Robinson, 204 AD3d 708 (2nd Dept. 2022)("the fact that [the defendant's] score on the Static-99 classified him as a low risk to reoffend is not a circumstance which, standing alone, may be considered a mitigating factor."); People v. Linares, 217 AD3d 974, 975 (2nd Dept. 2023)("[C]ontrary to the defendant's contentions, his score on the 'COMPAS risk assessment does not, standing alone, qualify as an appropriate mitigating factor, and the defendant did not identify any specific, unique risk factor on the COMPAS assessment which would serve as a mitigating factor.'"). "The probative value of defendant's Static-99 score is limited because that assessment inadequately considers the underlying sex crime and the potential for harm in the event of reoffense." People v. Cruz, 154 AD3d 610 (1st Dept. 2017). "[T]he defendant's score on . . . risk assessment tools different from New York's risk assessment instrument does not, by itself, constitute a mitigating factor justifying a downward departure from the presumptive risk level." People v. Desnoyers, 180 AD3d 1080, 1081 (2nd Dept. 2020)(referencing the Static-99 and the Vermont Assessment of Sex Offender Risk tools). "[T]o the extent an offender may rely on individual risk factors in those instruments to demonstrate that he or she is at a lower risk of reoffense or poses less of a danger to the community, the defendant speaks only in general terms and fails to identify any specific risk factors in those instruments." Id. 
Here, SORA-Counsel fails to cite to any particular risk factor within the STATIC-99, COMPAS, or STABLE-2007 assessments which would serve as a mitigating factor. In light of the failure to identify any particular mitigating factor, and in consideration of the court system's recognition of the deficiencies in these other risk assessment tools in and of themselves as accurate predictors of dangerousness and risk of sexual recidivism, this Court finds that the defendant failed to satisfy the first step of the Gillotti analysis. Accordingly, the defendant's request for a downward departure on this basis is denied.
Finally, this Court has considered the defendant's arguments for a downward departure collectively, and to the extent such arguments may satisfy the first two steps of the Gillotti analysis, this Court does not find that in the totality these arguments require a downward departure to avoid an over-assessment of the defendant's dangerousness or risk of sexual recidivism. Thus, considered collectively the Court denies the defendant's request for a downward departure. 

Sex Offender Designation
As early as January 15, 2025, the People advised the defendant and this Court that they were seeking the defendant's designation as a sexually violent offender pursuant to Corr. Law § 168-a(3)(b). People's Exhibit 1. Pursuant to Correction Law § 168-k(2), it is "the duty of the court applying the guidelines established in subdivision five of section one hundred sixty-eight-l of this article to determine the level of notification pursuant to subdivision six of section one hundred sixty-eight-l of this article and whether such sex offender shall be designated a sexual predator, sexually violent offender, or predicate sex offender as defined in subdivision seven [*15]of section one hundred sixty-eight-a of this article." (Emphasis added). A "'[s]exually violent offender' means a sex offender who has been convicted of a sexually violent offense defined in subdivision three of this section." Corr. Law § 168-a(7)(b). As is pertinent here, a "'[s]exually violent offense' means a conviction of an offense in any other jurisdiction which includes all of the essential elements of any such felony provided for in paragraph (a) of this subdivision or conviction of a felony in any other jurisdiction for which the offender is required to register as a sex offender in the jurisdiction in which the conviction occurred." Corr. Law § 168-a(3)(b). The defendant was convicted of the following Wisconsin offenses: one felony count of Engaging in Repeated Acts of Sexual Assault of the Same Child in violation of Wisconsin Statute § 948.025(1)(e), one felony count of Exposing Genitals or Pubic Area in violation of Wisconsin Statute § 948.10(1)(a), and one misdemeanor count of Sexual Intercourse with a Child Aged 16 or Older in violation of Wisconsin Statute § 948.09. The defendant was required to register as a sex offender in the State of Wisconsin as a result of these convictions. 
Subsequent to the close of the SORA hearing the Court permitted the parties to submit memoranda of law regarding their positions on the defendant's designation. On April 4, 2025, SORA-Counsel filed their submission challenging the constitutionality of Corr. Law § 168-a(3)(b) (hereinafter "foreign registration clause") as applied to the defendant, as well as facially. On or about April 7, 2025, SORA-Counsel filed a copy of the same with the Attorney General of the State of New York pursuant to CPLR § 1012(b). On April 11, 2025, the People filed their memorandum of law addressing both the essential elements analysis and foreign registration clause contained within Corr. Law § 168-a(3)(b). On May 12, 2025, the Attorney General of the State of New York filed a letter response with this Court stating that they were not, at this time, seeking to intervene in this matter. This matter was conferenced with the parties and the Court on May 19, 2025 to see if either party wished to develop the record further with respect to the essential elements test and each of the parties advised that they were satisfied with their prior submissions.
Essential Elements Test
Both Corr. Law §§ 168-a(2)(d)(i) and 168-a(3)(b) contain essential elements provisions by which individuals now living in New York who have been convicted of certain crimes in foreign jurisdictions are required to register as sex offenders and/or sexually violent offenders, respectively. Correction Law § 168-a(2)(d)(i) provides that a person has been convicted of a sex offense requiring sex offender registration in New York if the conviction is for "an offense in any other jurisdiction which includes all of the essential elements of any such crime provided for in [Correction Law § 168-a(2)](a), (b), or (c) . . . " Correction Law § 168-a(3)(b) provides that a person has been convicted of a sexually violent offense requiring designation as a sexually violent offender in New York if the conviction is for "an offense in any other jurisdiction which includes all of the essential elements of any such felony provided for in [Correction Law § 168-a(3)(a)] . . . " 
The Court of Appeals noted that "[s]ince the inception of SORA in 1995, a person convicted of a felony in another jurisdiction, including a conviction of a federal crime, has been subject to registration in New York if the foreign offense 'includes all of the essential elements' of one of the New York offenses listed in SORA." North v. Board of Examiners of Sex Offenders of State of New York, 8 NY3d 745, 748-749 (2007). However, the Court of Appeals in [*16]North noted that their 2007 decision was their first opportunity since the inception of SORA for them to interpret the essential elements provision. Id. at 749. Within their analysis the Court of Appeals noted that they were "unpersuaded that the Legislature intended that the SORA 'essential elements' inquiry involve[d] the same strict equivalency approach used in the criminal enhanced sentencing context." Id. at 751. In reaching that conclusion the Court observed that "SORA is not a penal statute and the registration requirement is not a criminal sentence." Id. at 752. Instead, they noted that "SORA is a remedial statute intended to prevent future crime; its aim is to protect communities by notifying them of the presence of individuals who may present a danger and enhancing law enforcement authorities' ability to fight sex crimes." Id. (Internal citation omitted). "As opposed to the penal purposes of enhanced sentencing, the ultimate and paramount concern of the SORA risk-level assessment, is an accurate determination of the risk a sex offender poses to the public." People v. Perez, 35 NY3d 85, 94 (2020). "Thus, SORA's remedial purposes underlie both the initial registration determination and the secondary risk assessment level determination bearing on the frequency of registration and degree of community notification required." Id. Pursuant to the Correction Law, this would include reaching a determination on whether or not a designation is applicable, thus requiring lifetime registration. 
"[T]he 'essential elements' provision in SORA requires registration whenever an individual is convicted of criminal conduct in a foreign jurisdiction that, if committed in New York, would have amounted to a registerable New York offense." North v. Board of Examiners of Sex Offenders of State of New York, supra at 753. Application of this principle "necessarily requires that the Board compare the elements of the foreign offense with the analogous New York offense to identify points of overlap." Id. "When the Board finds that the two offenses cover the same conduct, the analysis need proceed no further for it will be evident that the foreign conviction is the equivalent of the registerable New York offense for SORA purposes." Id. "In circumstances where the offenses overlap but the foreign offense also criminalizes conduct not covered under the New York offense, the Board must review the conduct underlying the foreign conviction to determine if that conduct is, in fact, within the scope of the New York offense. If it is, the foreign conviction is a registerable offense under SORA's essential elements test." Id. See also People v. Perez, 35 NY3d 85 (2020). Logic dictates that the SORA courts are required to undertake this same analysis. 
More recently the Fourth Department has issued decisions illustrating that this application of the essential elements test is applied in the same manner with respect to determining whether a New York domiciliary convicted of a registerable sex offense in a foreign jurisdiction must be designated a sexually violent offender pursuant to Corr. Law § 168-a(3)(b). See People v. Cremeans, 194 AD3d 1369 (4th Dept. 2021); People v. Morgan, 213 AD3d 1244 (4th Dept. 2023). 
Pursuant to Corr. Law § 168-a(3)(b), a "'sexually violent offense' means a conviction of an offense in any other jurisdiction which includes all of the essential elements of any such felony provided for in paragraph (a) of this subdivision . . . " Corr. Law § 168-a(3)(b). Correction Law § 168-a(3)(a) provides that a "'sexually violent offense' means (i) a conviction of or a conviction for an attempt to commit any of the provisions of section 130.35, former section 130.50, sections 130.65, 130.66, 130.67, 130.70, 130.75, 130.80, 130.95 and 130.96 of the penal law, or (ii) a conviction of or a conviction for an attempt to commit any of the provisions of sections 130.53, 130.65-a and 130.90 of the penal law, or (iii) a conviction of or a conviction for [*17]an attempt to commit any provisions of the foregoing sections committed or attempted as a hate crime defined in section 485.05 of the penal law or as a crime of terrorism defined in section 490.25 of the penal law." 
I. Engaging in Repeated Acts of Sexual Assault of the Same Child
With respect to the defendant's conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child pursuant to Wisconsin Statute § 948.025(1)(e), "[w]hoever commits 3 or more violations under s. 948.02(1) or (2) within a specified period of time [FN5]
involving the same child is guilty of a Class C felony if at least 3 of the violations were violations of s. 948.02(1) or (2)." Based upon defense counsel's statements during the plea and sentence colloquy, a theory of Second Degree Sexual Assault of a Child was alleged pursuant to Wisconsin Statute § 948.02(2). People's Exhibit 2, pg. 10. A person commits Second Degree Sexual Assault of a Child when that person "has sexual contact or sexual intercourse with a person who has not attained the age of 16 years . . . " Wisconsin Statute § 948.02(2). 
With this foundational understanding of the elements of the crime to which the defendant pleaded guilty, this Court, pursuant to People v. Cremeans, supra, and People v. Morgan, supra, must compare the elements of this Wisconsin offense with analogous New York offenses which have been deemed to be per se sexually violent offenses pursuant to Corr. Law § 168-a(3)(a)(i) to identify points of overlap. The defendant's conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child pursuant to Wisconsin Statute § 948.025(1)(e) is fairly characterized as a course of conduct offense. As such, this Court will begin its comparison by analyzing the analogous New York offenses of Course of Sexual Conduct Against a Child in the First and Second Degree; sexually violent offenses contained within Corr. Law § 168-a(3)(a)(i). 
Pursuant to Penal Law § 130.75(1)(a), a "person is guilty of course of sexual conduct against a child in the first degree when, over a period of time not less than three months in duration he or she engages in two or more acts of sexual conduct, which includes at least one act of vaginal sexual contact, oral sexual contact, anal sexual contact or aggravated sexual contact, with a child less than eleven years old." Pursuant to Penal Law § 130.75(1)(b), a "person is guilty of course of sexual conduct against a child in the first degree when, over a period of time not less than three months in duration he or she, being eighteen years old or more, engages in two or more acts of sexual conduct, which include at least one act of vaginal sexual contact, oral sexual contact, anal sexual contact or aggravated sexual contact, with a child less than thirteen years old." Pursuant to Penal Law § 130.80(1)(a), a "person is guilty of course of sexual conduct against a child in the second degree when, over a period of time not less than three months in duration he or she engages in two or more acts of sexual conduct with a child less than eleven years old." Pursuant to Penal Law § 130.80(1)(b), a "person is guilty of course of sexual conduct against a child in the second degree when, over a period of time not less than three months in duration he or she, being eighteen years old or more, engages in two or more acts of [*18]sexual conduct with a child less than thirteen years old." 
Sexual conduct is defined as "vaginal sexual contact, oral sexual contact, anal sexual contact, aggravated sexual contact, or sexual contact." Penal Law § 130.00(10). Vaginal sexual contact is defined as "conduct between persons consisting of contact between the penis and the vagina or vulva." Penal Law § 130.00(1). Oral sexual contact is defined as "conduct between persons consisting of contact between the mouth and the penis, the mouth and the anus, or the mouth and the vulva or vagina." Penal Law § 130.00(2)(a). Anal sexual contact is defined as "conduct between persons consisting of contact between the penis and the anus." Penal Law § 130.00(2)(b). Aggravated sexual contact is defined as "inserting, other than for a valid medical purpose, a foreign object in the vagina, urethra, penis, rectum or anus of a child, thereby causing physical injury to such child." Penal Law § 130.00(11). Sexual contact is defined as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed." Penal Law § 130.00(3). 
The Wisconsin offense, premised upon a Second Degree Sexual Assault of a Child theory, criminalizes sexual contact or sexual intercourse with a person who has not attained the age of 16 years old, whereby the New York offense contains age ceilings of 11 and 13 years old. See Wisconsin Statute § 948.02(2); cf. Penal Law §§ 130.75(1)(a)-(b) and 130.80(1)(a)-(b). Thus, the Wisconsin offense criminalizes additional conduct that the New York statutes do not as the statute encompasses victims as old as 15 years old. As "the offenses overlap but the foreign offense also criminalizes conduct not covered under the New York offense, [this Court] must review the conduct underlying the foreign conviction to determine if that conduct is, in fact, within the scope of the New York offense." People v. Morgan, supra at 1245. 
Count 1 of the Amended Criminal Complaint to which the defendant plead guilty charged as follows:
The above-named defendant on or between May 18, 2012 and October 11, 2012, in the Town of Milford, Jefferson County, Wisconsin, did commit repeated sexual assaults involving the same child, JLL, DOB [XX/XX]/1998 where at least three of the assaults were violations of sec. 948.02(1) or (2) Wis. Stats., contrary to sec. 948.025(1)(e) Wis. Stats., a Class C Felony, and upon conviction may be fined not more than One Hundred Thousand Dollars ($100,000), or imprisoned not more than forty (40) years, or both.
People's Exhibit 1, pg. 21. Pertaining to Counts 1-3, the following sworn facts of Detective Sergeant Don Hunter of the Jefferson County Sheriff's Office were recited:
On 03/03/14, [L.]L. reported that in the summer of 2012 her 14-year-old daughter, JLL (DOB:[XX/XX]/98), was sexually assaulted by suspect Shaun O'Keefe at [the R.B.R. campground], located [in the], Town of Milford, Jefferson County, Wisconsin. JLL had recently disclosed the sexual abuse to [L.L.]. [L.L.'s] family periodically stayed at a [R.B.R.] campsite during that summer.
On 03/06/14, JESO Detective Leah Meyer conducted a step-wise interview with JLL. JLL detailed ongoing sexual abuse by Shaun O'Keefe which occurred at a variety of locations in the campground during the summer of 2012. The assaults occurred during golf cart rides with Shaun during the night time and also in his camper (site #127). [*19][L.L.'s] sites (#131 & 132) were adjacent to Shaun's and the family frequently socialized with him. JLL advised that during night time golf cart rides with Shaun, he initiated sexual contact by forcing her to touch his penis both over and under his clothes with her hand. Shaun used his hand to move JLL's hand in a rubbing motion on his clothes' covered penis. Shaun also made JLL masturbate his exposed penis with her hand; due to the illumination of the cart's headlights JLL saw his penis sticking out of his fly, it 'stood straight up and was hard.' During the golf cart rides, Shaun's 9-year-old son ALO rode in the back and was unaware of the assaults. Shaun threatened to kill JLL if she told anyone about the assaults which caused the delay in reporting. JLL estimated that this sexual contact occurred on 3 or 4 occasions.
JLL also told Det. Meyer that the last sexual assault by Shaun occurred in his camper trailer, possibly in August 2012. JLL had taken 9-year-old ALO to the pavilion to listen to music. She returned to Shaun's trailer with ALO so he could get a drink; when she attempted to leave, Shaun arrived and asked ALO to step outside so he could speak privately with JLL. Shaun then closed the camper door and pushed JLL face first up against the door and he stood behind her. Shaun pulled down her pants and underwear, and forcefully inserted his penis into her body. JLL thinks he put his penis into her anus, because it was very painful and afterwards when he pulled it out, it made her feel like she had to 'poop.' His penis stayed in her body for 60-90 seconds without motion. She was in so much pain that she tried to scream, but he put his hand over her mouth to muffle her cries. Shaun may have locked the door at the onset of the assault; regardless JLL didn't feel free to leave because he'd trapped her in his camper. She believed that Shaun ended the assault because ALO was waiting outside.
Det. Meyer interviewed [K.M.], who camped at site #128, by [L.L.] and Shaun O'Keefe in the summer of 2012. She is also the reservation manager for [R.B.R. campground]. [K.M.] accessed the reservation records and determined that Shaun O'Keefe stayed at site #127 from 05/02/12 to 10/11/12. [L.L.'s] family camped there from 05/18/12 to 10/09/12 at sites #131 & 132.
On 06/12/14, Det. Meyer interviewed Shaun O'Keefe at the Hartford Police Dept. Shaun admitted to engaging in sexual contact with JLL during the summer of 2012 because he'd developed a sexual attraction to teenage girls that summer. Shaun admitted to the incidents on the golf cart rides with JLL. He said that JLL touched his penis over clothes, and possibly under his clothes on 2 occasions. Shaun also admitted that he rubbed his hand on JLL's vaginal area over her clothes 1 time during a golf cart ride. He acknowledged that his son ALO was on these same golf cart rides. Shaun claimed no recollection of the assault of JLL in his camper.
Id. at 22-23. During the defendant's plea colloquy the defendant admitted that the above-recited facts as contained within the Amended Criminal Complaint were accurate. Specifically, the plea colloquy stated as follows:
MR. BORDA: Yes, Judge. I just wanted to clarify one thing. You mentioned if my client had reviewed the original criminal complaint. It was an amended criminal complaint that was filed and that was filed June 18th, 2014. And that is the information that the Court should use as a basis to accept my client's plea.
THE COURT: Excellent. Thank you for pointing that out. So did you go through the [*20]amended criminal complaint, Mr. O'Keefe?
THE DEFENDANT: Yes.
THE COURT: And are the facts that are set out in that amended complaint true and correct?
THE DEFENDANT: Yes.
People's Exhibit 2, pgs. 8-9.
In light of the fact that the victim of this crime, J.L.L., was 14 years old at the time of her victimization by the defendant, this Court cannot conclude that the defendant's Wisconsin conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child is tantamount under the essential elements test to the New York offenses of Course of Sexual Conduct Against a Child in the First or Second Degrees. 
This Court does not find that the analysis ends there, however. The defendant's conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child, in sum and substance, alleges that on or between the dates May 18, 2012 and October 11, 2012 the defendant committed three or more acts of Second Degree Sexual Assault of a Child. A person commits Second Degree Sexual Assault of a Child when that person "has sexual contact or sexual intercourse with a person who has not attained the age of 16 years . . . " Wisconsin Statute § 948.02(2). Thus, the conviction further distills to charging the defendant with engaging in sexual contact or sexual intercourse with an individual under 16 years of age on at least three occasions. It is the opinion of this Court that the essential elements test further requires this Court to determine whether Second Degree Sexual Assault of a Child in violation of Wisconsin Statute § 948.02(2) includes all of the essential elements of an analogous sexually violent offense enumerated within Corr. Law § 168-a(3)(a)(i). 
Pursuant to Wisconsin law, "'[s]exual contact' means any of the following: (a) any of the following types of intentional touching, whether direct or through clothing, if that intentional touching is either for the purpose of sexually degrading or sexually humiliating the complainant or sexually arousing or gratifying the defendant: (1) intentional touching by the defendant or, upon the defendant's instruction, by another person, by the use of any body part or object, of the complainant's intimate parts, (2) intentional touching by the complainant, by the use of any body part or object, of the defendant's intimate parts or, if done upon the defendant's instruction, the intimate parts of another person, (b) intentional penile ejaculation of ejaculate or intentional emission of urine or feces by the defendant or, upon the defendant's instruction, by another person upon any part of the body, clothed or unclothed, of the complainant if that ejaculation or emission is either for the purpose of sexually degrading or sexually humiliating the complainant or for the purpose of sexually arousing or gratifying the defendant, or (c) for the purpose of sexually degrading or humiliating the complainant or sexually arousing or gratifying the defendant, intentionally causing the complainant to ejaculate or emit urine or feces on any part of the defendant's body, whether clothed or unclothed." Wisconsin Statute § 948.01(5). "'Sexual intercourse' means vulvar penetration as well as cunnilingus, fellatio or anal intercourse between persons or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening either by the defendant or upon the defendant's instruction. The emission of semen is not required." Wisconsin Statute § 948.01(6). 
This Court will first compare the elements of Second Degree Sexual Assault of a Child to the analogous New York offense of Rape in the First Degree. Rape in the First Degree pursuant to Penal Law § 130.35 is a sexually violent offense listed within Corr. Law § 168-a(3)(a)(i). "A [*21]person is guilty of rape in the first degree when he or she engages in anal sexual contact with another person by forcible compulsion." Penal Law § 130.35(3)(a). Assuming arguendo that J.L.L.'s belief that she was penetrated anally by the defendant was inaccurate and that she was instead penetrated vaginally, Penal Law § 130.35(1)(a) provides that a "person is guilty of rape in the first degree when he or she engages in vaginal sexual contact with another person by forcible compulsion." The Penal Law definitions of vaginal sexual contact and anal sexual contact recited above remain accurate for this crime of Rape in the First Degree. See Penal Law §§ 130.00(1) and 130.00(2)(b). "'Forcible compulsion' means to compel by either (a) use of physical force; or (b) a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person, or in fear that he, she or another person will immediately be kidnapped." Penal Law § 130.00(8)(a)-(b). 
As Second Degree Sexual Assault of a Child criminalizes sexual contact in addition to sexual intercourse this Court observes that while the offenses overlap, the Wisconsin statute criminalizes conduct not covered under the New York statute. Accordingly, this Court is permitted to review the conduct underlying the Wisconsin conviction to determine if that conduct is within the scope of New York's Rape in the First Degree statute. People v. Cremeans, 194 AD3d 1369, 1370 (4th Dept. 2021); People v. Morgan, 213 AD3d 1244 (4th Dept. 2023). Relying upon the facts contained within the Amended Criminal Complaint which the defendant admitted during his plea colloquy were true and correct, it is clear that the defendant's conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child based upon a theory of Second Degree Sexual Assault of a Child is tantamount under the essential elements test to the New York sexually violent offense of Rape in the First Degree. The defendant's actions in pushing J.L.L. face first against a door, standing behind her and pulling her pants and underwear down, and then forcefully inserting his penis into her body, whether her vagina or her anus, constitute engaging in vaginal or anal sexual contact with another person by forcible compulsion (i.e., physical force), as contemplated by New York's Rape in the First Degree statute. In light of this determination, the defendant's conduct also satisfies the essential elements test in regard to former Penal Law § 130.50(1)[FN6]
, Criminal Sexual Act in the First Degree, as it prohibited engaging in anal sexual conduct with another person by forcible compulsion. See Corr. Law § 168-a(3)(a)(i). 
A similar conclusion is reached when comparing the elements of Second Degree Sexual Assault of a Child to the analogous New York offense of Sexual Abuse in the First Degree. Sexual Abuse in the First Degree pursuant to Penal Law § 130.65(1) is a sexually violent offense listed within Corr. Law § 168-a(3)(a)(i). "A person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact by forcible compulsion." Penal Law § 130.65(1). Again,s sexual contact is defined as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing, as well as the emission of ejaculate by the actor upon any part of the victim, clothed or unclothed." Penal Law § 130.00(3). The definition of forcible compulsion is [*22]the same as defined above for Rape in the First Degree. See Penal Law § 130.00(8)(a)-(b). 
As Second Degree Sexual Assault of a Child criminalizes sexual intercourse in addition to sexual contact this Court observes that while the offenses overlap, the Wisconsin statute criminalizes conduct not covered under the New York statute. Accordingly, this Court is permitted to review the conduct underlying the Wisconsin conviction to determine if that conduct is within the scope of New York's Sexual Abuse in the First Degree statute. People v. Cremeans, supra; People v. Morgan, supra. Relying upon the facts contained within the Amended Criminal Complaint which the defendant admitted during his plea colloquy were true and correct, it is clear that the defendant's conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child based upon a theory of Second Degree Sexual Assault of a Child is tantamount under the essential elements test to the New York sexually violent offense of Sexual Abuse in the First Degree. Each and every one of the defendant's actions in forcing J.L.L. during golf cart rides to touch his penis with her hand, both over and under his clothes, constitutes sexual contact by forcible compulsion as defined by the New York State Penal Law. J.L.L. estimated that this conduct occurred on 3 or 4 occasions, and when interviewed by law enforcement the defendant admitted to this conduct occurring on multiple occasions. The defendant also admitted to rubbing J.L.L.'s vaginal area on at least 1 occasion, constituting another instance of sexual contact by forcible compulsion. With respect to the defendant's sexual contact with J.L.L. during these golf cart rides, the defendant's conduct satisfies both of New York's theories of forcible compulsion. Forcing J.L.L. to touch his penis by way of using his hand to grab her hand and, by way of exerting some measure of physical force, compelling J.L.L. to touch his penis by placing her hand on his penis would constitute forcible compulsion by physical force. See Penal Law § 130.00(8)(a). Moreover, the Amended Criminal Complaint, as recited above, alleged that the defendant threatened to kill J.L.L. if she told anyone about the sexual contact on the golf cart rides. The defendant did not dispute this allegation during his plea colloquy. Accordingly, such a death threat would constitute forcible compulsion in the form of a threat, express or implied, which places a person in fear of immediate death or physical injury. See Penal Law § 130.00(8)(b). Finally, the defendant's anal assault of J.L.L. within his camper certainly satisfies the less stringent sexual contact by forcible compulsion threshold in light of this Court's determination above that such assault constituted the New York offense of Rape in the First Degree by way of forcible compulsion. Accordingly, the defendant's conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child based upon a theory of Second Degree Sexual Assault of a Child is tantamount under the essential elements test to the New York sexually violent offense of Sexual Abuse in the First Degree. 
Based upon the documentary evidence the People introduced at the hearing, the People have proven by clear and convincing evidence that the defendant is properly designated as a sexually violent offender due to his conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child predicated upon a theory of Second Degree Sexual Assault of a Childpursuant to the Corr. Law § 168-a(3)(b) essential elements test. 
II. Exposing Genitals or Pubic Area
With respect to the defendant's conviction for Exposing Genitals or Pubic Area in violation of Wisconsin Statute § 948.10(1)(a), such statute provides that "[w]hoever, for purposes of sexual arousal or sexual gratification, causes a child to expose genitals or pubic area [*23]or exposes genitals or pubic area to a child is guilty of . . . a Class I felony." The elements of this statute do not satisfy the essential elements of a sexually violent offense enumerated within Correction Law § 168-a(3)(a).
III. Sexual Intercourse with a Child Aged 16 or Older
With respect to the defendant's conviction for Sexual Intercourse with a Child Aged 16 or Older in violation of Wisconsin Statute § 948.09, such statute provides that "[w]hoever has sexual intercourse with a child who is not the defendant's spouse and who has attained the age of 16 years is guilty of a class A misdemeanor." "'Sexual intercourse' means vulvar penetration as well as cunnilingus, fellatio or anal intercourse between persons or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening either by the defendant or upon the defendant's instruction. The emission of semen is not required." Wisconsin Statute § 948.01(6). Such crime would constitute the New York felony of Rape in the Third Degree in violation of Penal Law § 130.25, and such crime is not enumerated within Correction Law § 168-a(3)(a).
Foreign Registration Clause Contained Within Correction Law § 168-a(3)(b)
I. Defendant's As Applied Due Process Challenge
The defendant has challenged the second disjunctive clause contained within the foreign registration clause (i.e., Correction Law § 168-a[3][b]) as unconstitutional as applied to the defendant alleging that it violates (i) the defendant's substantive due process rights, (ii) the Privileges and Immunities Clause, and (iii) the Equal Protection Clause. Separate and apart from the defendant's "as applied" challenge, the defendant has moved this Court to find that the foreign registration clause is facially unconstitutional in that it bears no rational relationship to a legitimate governmental purpose under any conceivable set of circumstances. 
The New York State Court of Appeals held that the foreign registration clause requires that an offender convicted of a felony in another state for which sex offender registration is required who moves into New York State be designated a sexually violent offender regardless of whether the underlying offense is violent in nature. See People v. Talluto, 39 NY3d 306, 309 (2022). "[T]he decision whether to designate a defendant a sexually violent offender is not a matter with respect to which the adjudicating court may exercise discretion . . . The Court is bound by the statute." Id. at 315. Because it was not preserved for appeal, however, the Court of Appeals expressly noted that it was not addressing the merits of any amici briefs questioning the constitutionality of the foreign registration clause. This issue was directly raised by the defendant in this case, however. 
"Under the Fourteenth Amendment to the United States Constitution, a state government may not deprive an individual of life, liberty, or property, without due process of law." People v. Malloy, 228 AD3d 1284, 1287 (4th Dept. 2024) (Internal citations omitted). "Due process review generally is comprised of two distinct analyses: procedural due process, the bedrock of which is notice and an opportunity to be heard, and substantive due process, i.e., the right to be free from certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." Id. (Internal citations omitted). As in Malloy, the [*24]defendant herein has not raised any procedural due process objections. Thus, this Court, too, will focus exclusively on the defendant's substantive due process claims. "As the term implies, an as-applied challenge calls on the court to consider whether a statute can be constitutionally applied to the defendant under the facts of the case." People v. Brown, 41 NY3d 279, 284 (2023) quoting People v. Stuart, 100 NY2d 412, 421 (2003). 
Substantive due process "protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." Id. (Internal citation omitted). "Substantive due process provides heightened protection against government interference with certain fundamental rights and liberty interests . . . , namely those rights and interests that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Id. (Internal citations omitted). As in Malloy, this Court, too, finds that the defendant's constitutional claims are subject to rational basis review. Id. at 1288. 
The rational basis test "involves a strong presumption that the challenged legislation is valid, and a party contending otherwise bears the heavy burden of showing that a statute is so unrelated to the achievement of any combination of legitimate purposes as to be irrational. Id. (Internal citation omitted). "A challenged statute will survive rational basis review so long as it is rationally related to any conceivable legitimate State purpose . . . and courts may even hypothesize the Legislature's motivation or possible legitimate purpose." Id. 
Here, the People have satisfied their burden of proving, by clear and convincing evidence, that the defendant was convicted of Repeated Acts of Sexual Assault of the Same Child in violation of Wisconsin Statute § 948.025(1)(e), a felony in the State of Wisconsin, and that such conviction requires his registration as a sex offender in the State of Wisconsin. See Wisconsin Statutes §§ 948.025(1)(e); 301.45(1d)(b). Thus, pursuant to Correction Law § 168-a(3)(b), the defendant must be designated a sexually violent offender unless the defendant can satisfy his burden of proving that the statute is so unrelated to the achievement of any combination of legitimate purposes as to be irrational. Id. Under People v. Knox, 12 NY3d 60, 66 (2009), the defendant has a constitutionally-protected liberty interest for purposes of substantive due process in not being required to register under an incorrect label. See also People v. Brown, 41 NY3d 279, 285 (2023). 
The defendant sought to satisfy his burden by relying heavily upon the Court of Appeals determination in People v. Brown, 41 NY3d 279 (2023). The instant case is factually distinguishable from that case, however. In Brown, supra, the defendant was convicted of the New York felony of Unlawful Imprisonment in the First Degree in violation of Penal Law § 135.10. Pursuant to Correction Law § 168-a(2)(a)(i), such crime was deemed a sex offense for which SORA registration was required. Id. The SORA court, feeling "constrained by state law," designated the defendant a Level 1 sex offender despite the People conceding, and the Court specifically finding, that the "defendant's sole motivation was to steal money and that the offense involved no sexual contact or motivation." Id. at 282-283. The Court of Appeals ultimately reversed the SORA court's determination and vacated the defendant's designation as a sex offender, finding that, as applied to the defendant, "application of SORA's sex offender designation and registration requirement to defendant is a clear violation of his due process rights." Id. at 300. The rationale for that holding was that the mislabeling of the defendant as a sex offender for a conviction which was entirely unrelated to any sexual activity or threat of [*25]sexual activity was an as applied violation of the defendant's due process rights. Id. 
Here, the defendant argues that he is being mislabeled as a sexually violent offender. This Court disagrees. Designating the defendant as a sexually violent offender in this case in no way mislabels him. Contrary to the Fourth Department cases cited by SORA-Counsel, (1) the BESO recommended the assignment of points under risk factor 1 for Use of Violence, (2) the People recommended that points be assigned under two separate categories for risk factor 1 and the Use of Violence, and (3) SORA-Counsel at the SORA hearing agreed that points were properly assigned under risk factor 1 for Use of Violence. Cf, People v. Brightman, 230 AD3d 1527, 1530 (4th Dept. 2024); People v. Malloy, 228 AD3d 1284, 1286 (4th Dept. 2024); People v. Cromwell, 229 AD3d 1176, 1177 (4th Dept. 2024); People v. Zellefrow, 229 AD3d 1069, 1070 (4th Dept. 2024). This Court then, after considering the evidence received at the hearing and the arguments of the parties not only found that points should be assigned under risk factor 1 for the defendant's use of forcible compulsion, but also found that enhanced points should be assigned for the defendant's infliction of physical injury. Thus, when analyzing this case in the manner in which the Court of Appeals did in Brown, supra the factual conduct committed by the defendant does appropriately support the labeling of the defendant as a sexually violent offender. Under this lens, as the defendant would not be factually mislabeled if designated a sexually violent offender, the community would neither be misled nor misinformed by the defendant's designation as such. 
Additionally, a significant factor which SORA-Counsel ostensibly overlooks is the fact that the defendant's conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child in violation of Wisconsin Statute § 948.025(1)(e) subjected him to lifetime sex offender registration in the State of Wisconsin. His lifetime registration requirement, however, was noted within the transcript of the defendant's plea and sentencing proceeding (i.e., People's Exhibit 2, pg. 32) and throughout People's Exhibit 1 (People's Exhibit 1, pg. 17, 19, 26-28, 39, 237-238, 240). See Wisconsin Statute § 301.45(5). Here in the State of New York, the only way that an individual becomes subject to lifetime sex offender registration is to be designated a sexual predator, sexually violent offender, or predicate sex offender, all as defined in Correction Law § 168-a(7). See Correction Law § 168-h(2). This reality further discredits the defendant's argument that designating him a sexually violent offender misidentifies his dangerousness or risk of sexual recidivism in that it ensures that the defendant is subject to the same length term of sex offender registration here in New York as he was subject to in Wisconsin (i.e., lifetime supervision). This is particularly the case here in which designating the defendant as a sexually violent offender simply ensures his lifetime registration in New York but otherwise imposes no greater registration requirements or burdens upon the defendant than his risk level 3 classification already imposes upon him. It also imposes no greater registration requirements or burdens upon the defendant than what his lifetime registration requirements were in the State of Wisconsin. Cf, Wisconsin Statute § 301.45.
Accordingly, the defendant has failed to sustain his burden of proving that, as applied to this defendant, the foreign registration clause is so unrelated to the achievement of any combination of legitimate purposes as to be irrational.
II. Facial Constitutionality
"[A] facial constitutional challenge under the Due Process Clause must fail so long as [*26]there are circumstances under which the challenged provision could be constitutionally applied." People v. Malloy, 228 AD3d 1284, 1291 (4th Dept. 2024) (Internal citation omitted). "In other words, the challenger must establish that no set of circumstances exists under which the statute would be valid." Id. (Internal citations omitted). The Malloy Court did "not believe that the sexually violent offenses identified in section 168-a(3)(a)(i) comprise the entire universe of sex crimes that could be deemed sexually violent in nature," and further held that for an offender convicted of such an offense, "the lifetime registration requirement associated with the designation of sexually violent offender would bear a rational relationship to the governmental interest of protecting the public from potential harm by sex offenders, thereby defeating a facial challenge to the statute." Id. 
In light of the fact that the defendant's as applied challenge has failed, this case serves as an excellent example of why the foreign registration clause survives rational basis review not only as applied, but facially, too. A legitimate purpose achieved by this statute is to ensure that New York State does not become a state that convicted sex offenders from other states flock to in order to enjoy less onerous and/or shorter terms of sex offender registration/supervision than the supervision terms they are subject to in the state where their offense was committed. While the New York foreign registration clause may paint with a broad brush, it does serve a legitimate state interest in ensuring that no sex offender who moves to the State of New York becomes subject to a lesser term of sex offender registration than they would have been if they remained in their state of conviction. This, in turn, ensures that the residents of the State of New York may feel secure in knowing that the sex offenders living amongst them in the community are receiving no less stringent supervision than they would have in their home state. The instant case illustrates the not-so-hypothetical nature of this point. In Wisconsin, the defendant's conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child carries with it lifetime sex offender registration. If the defendant's conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child did not satisfy the essential elements test, and if the defendant were not designated a sexually violent offender pursuant to the foreign registration clause, then the defendant, otherwise herein designated a Level 3 sex offender, conceivably, and legally, could no longer be subject to sex offender registration after as little as 20 years [FN7]
. Strict application of the foreign registration clause does, in fact, close what would otherwise constitute a loophole in New York's sex offender registration scheme where out-of-state sex offenders subject to lifetime registration whose convictions do not fit neatly into New York's definition of sexual predator, sexually violent offender, or predicate sex offender, could escape lifetime sex offender registration.
III. Privileges and Immunities Clause
"The Privileges and Immunities Clause (U.S. Const., Art. IV, § 2) . . . was intended to [*27]place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." People v. Malloy, 228 AD3d 1284, 1292 (4th Dept. 2024). Just as the Court in Malloy observed, this Court also finds that the foreign registration clause "does not discriminate unfairly on the basis of state citizenship; instead, it draws its distinctions based on the location of an offender's illegal conduct." Id. See also People v. Cromwell, 229 AD3d 1176, 1178 (4th Dept. 2024) (Finding the defendant's Privileges and Immunities Clause challenge to the foreign registration clause lacked merit); People v. Boldorff, 235 AD3d 1274, 1276 (4th Dept. 2025) (Finding the defendant's Privileges and Immunities Clause challenge to the foreign registration clause lacked merit). Indeed, "New York is treating [this] defendant in exactly the same way that it would be statutorily authorized to treat a New York resident who committed the same sex crime while visiting Kansas." Id; cf. People v. Schultz, 234 AD3d 1143 (3rd Dept. 2025) (Defendant was a New York domiciliary convicted of a sex offense in Florida who sought to return to New York after completion of his carceral sentence and was designated a sexually violent offender under the foreign registration clause. Case was remitted to County Court to address as-applied constitutional challenge to the foreign registration clause that was raised for the first time on appeal.). 
Accordingly, the defendant's as applied challenge regarding the Privileges and Immunity Clause is without merit and denied.
IV. Equal Protection Clause
In light of this Court's above findings regarding the defendant's as applied challenges upon the grounds of substantive due process and facial constitutionality, this Court does not find that the foreign registration clause violates the Equal Protection Clause as applied to the defendant. This case is a textbook example of why the foreign registration clause survives a facial constitutionality attack, and why, when coupled with the procedural due process afforded to all out-of-state sex offenders who move to New York (i.e., a SORA classification and designation hearing) the statute survives an equal protection argument. 
The law is an ever-evolving landscape and what this case has illustrated is that while the foreign registration clause may paint with the broadest of brushes, the procedural due process afforded the defendant in the form of the SORA hearing, coupled with the guidance provided by the prevailing case law, affords sex offenders moving to the State of New York sufficient due process and equal protection under the law to ensure that only those individuals deserving, on an as applied basis, a designation as a sexually violent offender under the foreign registration clause be so designated. It is the SORA courts who serve as guardians of defendants' constitutional rights, as championed by those defendants' attorneys, to ensure that while the default designation for felony sex offenders moving into New York is that they be designated sexually violent offenders under the foreign registration clause such that designation only be assigned by the SORA court after due consideration of an as applied constitutional challenge raised by SORA defense counsel at the SORA hearing. This form of procedural due process ensures that offenders like the defendant herein do not take advantage of what would otherwise be a loophole providing for a shorter term of sex offender registration, and also ensures that sex offenders for whom such designation would be inappropriate never become subject to such labelling. So long as counsel for the defendant at the SORA hearing takes advantage of the procedural due process [*28]afforded to them by timely raising the as applied challenge to the foreign registration clause at the SORA hearing the issue can be fully vetted in advance of that designation ever being placed upon a defendant. Cf, People v. Schultz, 234 AD3d 1143 (3rd Dept. 2025) (Despite applicability of foreign registration clause no as applied constitutional challenge to such clause was raised at the SORA hearing). 
Accordingly, the defendant's as applied Equal Protection Clause argument is without merit and denied. 
Obtaining Pertinent and Complete Records from Other States
Despite the Fourth Department in Malloy giving little, if any, credence to the People's argument on appeal that New York prosecutors encounter difficulty obtaining "complete records relating to out-of-state convictions," the instant case, as well as many other SORA transfers this Court has handled, well exemplifies the minimal investigation conducted by the BESO prior to preparing their Case Summary, as well as the apparent intentional failure of the BESO to denote the defendant as a sexually violent offender due to his commission of a registerable felony in another state. Id. at 1289. While this Court does not agree with the People's argument herein that such difficulty in obtaining out-of-state records justifies designating all sex offenders moving to New York as sexually violent offenders, the dismissive nature with which this argument was met by the Fourth Department warrants discussion. 
As noted at the outset of this matter when detailing the procedural history, as well as reflected within Defendant's Exhibit G, the hearing in this matter was adjourned in order to comply with Correction Law § 168-k(2) based upon the belated receipt of the defendant's plea and sentencing transcript (i.e., People's Exhibit 2) from the State of Wisconsin. While not necessitating further adjournment of the hearing, the defendant's Wisconsin DOC records were not thereafter received until March 10, 2025 (i.e., People's Exhibit 3). The inefficient transfer of documentation and information across state lines regarding the very information the courts will rely upon in assigning a risk level and designation is significant and real. In this case, the BESO was unable to provide any meaningful information at all about 2 of the 15 risk factors simply because it did not have any information pertaining thereto. With respect to risk factor 12 regarding Acceptance of Responsibility, whether the defendant "engaged in sex offender treatment while incarcerated [was] ultimately unknown," due to the BESO's lack of information. People's Exhibit 1, pg. 8. With respect to risk factor 13 regarding Conduct While Confined, the BESO noted that in the defendant's "Transfer Request paperwork, no conduct reports were provided. Therefore, absent clear and convincing evidence to the contrary, his conduct while confined will be considered satisfactory." Id. With respect to alcohol and substance abuse programming, the BESO noted that as "part of his Judgment of Conviction, he is required to undergo an Alcohol or Other Drug Abuse Assessment (AODA) and to follow through with any recommendation. If he has undergone such an assessment, the results are not known to the Board. Whether he was required to enroll in a substance abuse program while incarcerated is also unknown." Id. Finally, despite the BESO noting in their Case Summary that the defendant was convicted of a Wisconsin felony offense that requires sex offender registration in the State of Wisconsin, the BESO, apparently intentionally, failed to check the Sexually Violent Offender box along with the line denoting the reason for such designation where it is already pre-filled stating, "A . . . conviction of a felony in any other jurisdiction for which the offender is required [*29]to register as a sex offender in the jurisdiction which the conviction occurred." People's Exhibit 1, pgs. 2-4 While this Court well understands that the RAI and content of the Case Summary provided by BESO is a recommendation, one is still left to speculate as to why the BESO, despite acknowledging the defendant's conviction of a registerable felony in another state within the Case Summary and recommending the assignment of points under risk factor 1, failed to indicate the applicability of the foreign registration clause on their Sex Offender Designation Form when this Court's determination of the sex offender's designation, if any, if mandatory. See Correction Law § 168-k(2) ("It shall be the duty of the county court or supreme court in the county of residence of the sex offender, applying the guidelines established in subdivision five of section one hundred sixty-eight-l of this article, to determine the level of notification pursuant to subdivision six of section one hundred sixty-eight-l of this article and whether such sex offender shall be designated a sexual predator, sexually violent offender, or predicate sex offender as defined in subdivision seven of section one hundred sixty-eight-a of this article.") (Emphasis added). 
Indeed, between this case and the many others cited within the instant Decision it appears that the BESO's failure to note the applicability of the foreign registration clause is intentional, as opposed to a mere oversight. See People v. Malloy, 228 AD3d 1284 (4th Dept. 2024); People v. Brightman, 230 AD3d 1527 (4th Dept. 2024); People v. Cromwell, 229 AD3d 1176 (4th Dept. 2024); People v. Talluto, 39 NY3d 306 (2022); People v. Schultz, 234 AD3d 1143 (3rd Dept. 2025). One can only opine as to what other information, if any, the BESO is selectively not bringing to the attention of the courts, the parties, and the defendants. While this Court understands that the BESO is tasked with making a recommendation to the Court and that a recommendation inherently involves the exercise of subjective discretion, the instant case illustrates how the BESO's ostensible intentional failure to bring to the attention of the defendant, the parties, and this Court the applicability of the foreign registration clause for the parties to vet in the context of the SORA hearing may bring with it the unintended consequence of depriving the citizens of this state of the lifetime registration which this defendant would have otherwise received had he remained in the State of Wisconsin. This is particularly egregious where, as here, this Court has also concluded that the defendant's underlying offense was indeed a crime involving sexual violence and satisfied the essential elements test [FN8]
regarding three separate sexually violent offenses.
Additionally, while the Fourth Department may opine that information pertaining to sex offenders freely and easily flows across state lines, the practical reality known by the boots-on-the-ground practitioners routinely handling these matters is that the information provided to the BESO is often incomplete or lacking, as it was here. Moreover, the parties seeking to obtain information from out-of-state agencies often experience difficulties with subpoena compliance or delay related thereto, and all-the-while the particular defendant remains living within New York State unclassified, undesignated, and without any community notification occurring.
Further obfuscating the ability of the parties to obtain pertinent documentation relating to an out-of-state sex offender is the amount of time which may have passed since the conviction was obtained. If a carceral sentence were imposed in the home state the sex offender would not [*30]even be eligible to be classified/designated in New York until after completion of that sentence, however long that may be. Then, classification and designation in New York would only occur after that individual moved to New York. Accordingly, by way of example, if an offender received a 10-year prison sentence in their home state, served that sentence and remained living in their home state for another 10 years, and only then decided to move to New York, the parties to the New York SORA hearing would be tasked with obtaining records from 20 years earlier. The nature and quality of the records that may exist after that length of time, while speculative, is unlikely to be the same as it would be closer in time to when the conviction occurred. And while the same may be true with respect to New York sex offenders reentering the community after lengthy prison sentences, an important difference is that New York prosecutors are familiar with the different types of New York agencies possessing documentation pertinent to a SORA hearing, and those New York prosecutors would be in possession of their own file, documentation, and evidence pertaining to the underlying offense. In the context of out-of-state offenders, New York prosecutors are much less likely to have a rolodex of the pertinent entities in each and every state which may have relevant information for SORA purposes. Further, New York prosecutors are unlikely to even know the correct names or titles of the documentation they may be seeking, given that different states refer to their legal documentation by different names. Were every shred of documentation and record saved in an easily transmittible form, in perpetuity, for every sex offense matter just in case an offender moved to another state then the opinion of the Fourth Department would be understandable. Such an opinion, however, is not the reality facing the SORA courts and the parties practicing before them.
Interest in Not Being Mislabeled
A final point which warrants discussion in the context of this proceeding is how the "stigma of . . . misdesignation unconstitutionally impacts defendant's liberty interest in a criminal designation that rationally fits his conduct and public safety risk." People v. Brown, 41 NY3d 279, 290 (2023). While this Court has concluded above that designating this defendant a sexually violent offender does not mislabel him due to the fact that his underlying offense involved violence, thus rationally fitting his conduct, and that the designation imposes the same lifetime registration that was required in Wisconsin, thus rationally and proportionally fitting his public safety risk, this Court observes that mislabeling occurs in a number of contexts within the Penal Law and Correction Law. 
Many of the "sexually violent offenses" listed within Correction Law § 168-a(3)(a) may be factually committed without the use of violence. Nonetheless, the legislature deemed those enumerated offenses, including attempts to commit those offenses, per se sexually violent requiring designation and lifetime registration. Penal Law § 70.02(1)(a)-(d) also sets forth a number of crimes deemed to be per se violent felony offenses despite the factual content underlying them potentially involving no actual violence at all. As the People note, the Third Department has sanctioned the legislature's selection and designation of certain crimes as violent felonies regardless of whether violence was factually used. See People v. Johnson, 38 AD3d 1057, 1059 (3rd Dept. 2007). In that case the defendant was convicted of Burglary in the Second Degree, a violent felony offense pursuant to Penal Law § 70.02(1)(b), despite simply entering the victim's apartment without breaking or threat and thereafter readying himself to, ostensibly, steal her belongings. When caught by the victim inside her apartment the defendant then [*31]peaceably left upon the victim's request. The Third Department rejected the defendant's "challenges as unconstitutional or illegal the legislative classification of burglary in the second degree as a violent felony because no violence was used or proven in this case, arguing that he was denied due process because he was not allowed to contest this classification." Id. Thus, while the defendant used no violence at all in committing this crime he was thereafter, if not otherwise before, deemed a violent felony offender. 
An important distinction between Johnson and the instant case is that this Court knows of no online registry informing the community of the whereabouts of individuals in New York who have been convicted of violent felony offenses that are not sex offenses. Therefore, the liberty interest affected by the stigma of being convicted of a violent felony offense like Burglary in the Second Degree which involved no underlying factual violence, and therefore being "mislabeled" a violent felony offender, is different only in that that designation is not broadcast and/or available to the public via online registry. While this Court again holds that under no lens is the defendant herein mislabeled by being designated as a sexually violent offender, this Court elucidates this distinction only to illustrate that the apparent fine line drawn by the appellate courts is whether that designation is widely accessible by the community, and so long as it is not, mislabeling is apparently not of constitutional dimension. 

CONCLUSION
Evidence as to the foregoing is found to be clear and convincing that the defendant presents a total risk factor score of 145 points. Additionally, this Court finds that the People have proven, by clear and convincing evidence, that the defendant is a sexually violent offender pursuant to both prongs of Correction Law § 168-a(3)(b). Accordingly, the defendant is deemed a sexually violent offender pursuant to Correction Law § 168-k(2). Therefore, he should be designated as a Level 3 Sexually Violent Offender.
Therefore, it is hereby:
ORDERED that the defendant is designated a Level 3 Sexually Violent Offender, pursuant to Article 6-C of the New York State Correction Law. 
The foregoing constitutes the Decision and Order of this Court.
DATED: June 4, 2025

Footnotes

Footnote 1:The BESO Case Summary states that the defendant's supervision was transferred to New York and accepted by DOCCS on September 17, 2014. Such date is an apparent typographical error given the fact that the defendant was not convicted of these crimes until approximately 3 months later, on December 16, 2014. Based upon a review of the records contained within People's Exhibit 1, the correct date appears to be September 17, 2024.

Footnote 2:At the SORA hearing in this matter the defendant advised that he had moved from Warren County, New York to Washington County, New York shortly before the SORA hearing. The parties agreed that Warren County was the proper venue for this proceeding.

Footnote 3:The defendant's conviction for Engaging in Repeated Acts of Sexual Assault of the Same Child in violation of Wisconsin Statute § 948.025(1)(e) requires New York sex offender registration because that offense is a felony which requires sex offender registration in the State of Wisconsin. See Corr. Law § 168-a(2)(d)(ii). The defendant's conviction for Sexual Intercourse with a Child Aged 16 or Older in violation of Wisconsin Statute § 948.09 requires New York sex offender registration because it includes all of the essential elements of the crime of Rape in the Third Degree in violation of New York State Penal Law § 130.25. See Corr. Law § 168-a(2)(d)(i).

Footnote 4:SORA-Counsel for the defendant did not stipulate to pages 248-580 of People's Exhibit 1 concerning Quad Graphics being received. Having reviewed such documentation and the minimal argument by the People pertaining thereto, the Court is not receiving pages 248-580 into evidence on relevance grounds. 

Footnote 5:The "specified period of time" referenced within this statute is a period of time chosen/charged by the prosecution. WIS JI-CRIMINAL JI-2107, Wisconsin Criminal Jury Instructions, Committee of the Wisconsin Judicial Conference, 2107 Repeated Acts of Sexual Assault of a Child - § 948.025. 

Footnote 6:Effective September 1, 2024, the contents of Penal Law §§ 130.50(1)-(4) were incorporated into the crime of Rape in the First Degree as contained within Penal Law §§ 130.35(2)-(3), and Penal Law § 130.50(1)-(4) was repealed.

Footnote 7:Pursuant to Correction Law § 168-o(2), as soon as the defendant's risk level classification is determined the defendant may thereafter, annually, file a petition for the downward modification of his sex offender level. Were such petition(s) granted and the defendant's risk level modified downward from, in this case, a risk level 3 to a risk level 1, his sex offender registration would then end after 20 years. See Correction Law § 168-h(1).

Footnote 8:The BESO also failed to note the potential applicability of the Corr. Law § 168-a(3)(b) essential elements test on the Sex Offender Designation Form. People's Exhibit 1, pgs. 2-4.